■ STEPHANIE L. GROPER, Appellant-Respondent, v IRVING GROPER, Respondent-Appellant.—Judgment, Supreme Court, New York County (Simon Silver, J.H.O.), entered January 8, 1987, which, *inter alia,* granted appellant's conversion divorce based on the November 10, 1980 separation agreement between the parties, but which rescinded the provisions of said agreement relating to maintenance and the distribution of property and awarded appellant maintenance and a share of the marital assets, pursuant to Domestic Relations Law § 236

(B), and counsel fees in the amount of $50,000, modified, on the law and the facts and in the exercise of discretion, to reinstate those portions of the separation agreement which were rescinded, and to incorporate that agreement by reference in the judgment of divorce, and to delete the provisions in said judgment for maintenance and the award to respondent of a distributive share of the proceeds from the sale of the Park Avenue apartment, and otherwise affirmed, without costs.

The parties were married in November 1975. Respondent husband, a businessman with three children from a prior marriage which had ended in divorce, was then 48. Appellant, who was 36, was a commercial artist prior to this, her first marriage. As president of a family-owned liquor distributorship, respondent had substantial earnings during the marriage, ranging from $68,000 to $150,000 per year. However, he was required to pay substantial alimony to his first wife and had incurred debts totaling nearly $750,000 prior to the marriage.

A substantial capital gains tax liability had been assessed against respondent's mother resulting from a securities transaction which she undertook to raise $600,000 needed by respondent to pay his debts. This tax assessment was paid with funds from the family business which respondent and his brother agreed to repay. Nevertheless, the parties lived a rather luxurious life and appellant's standard of living was measurably improved. Prior to the marriage, and thereafter, respondent gave appellant approximately $1,500 per month for living expenses.

Respondent purchased a condominium in Boston, but the deed was in appellant's name. This condominium was sold and the proceeds applied to purchase a cooperative apartment on Park Avenue in New York. Respondent maintains that he also took a loan from the family business, secured by real estate in Massachusetts which he jointly owned with his brother, to purchase this apartment. Title to the Park Avenue cooperative was also in appellant's name.

Within two years difficulties arose and the parties temporarily separated in 1977. During this time, appellant resided in the Park Avenue apartment and respondent, who was frequently in Boston on business, lived in a rental apartment there.

Appellant became concerned about the parties' finances and

sought to protect her separate property by having an agreement drafted by her attorney. The parties discussed the agreement but respondent did not consult counsel before signing it on January 10, 1980. Respondent maintains that this was a "reconciliation agreement" and not a separation agreement, although at the time he "believed that we would separate for a little bit and come back together again." He consented to the agreement because he was "madly in love" with appellant and was willing to do whatever she wanted in the hope of saving their marriage.

Under the terms of this agreement, appellant was given exclusive rights to the Park Avenue cooperative, the furnishings and artwork therein, her jewelry and a $10,000 certificate of deposit, all of which were deemed her separate property. Respondent claims that he was unaware of the changes in the law then being contemplated in New York governing distribution of property upon the dissolution of a marriage, despite representations in the reconciliation agreement to the contrary. Although the parties were separated, they maintain amicable relations, and even vacationed together in Maine in July 1980.

Prior to this vacation, appellant learned of respondent's intention to sell his interest in the family business and met with respondent's accountant to discuss the proposed terms of sale, at respondent's urging. After this meeting, appellant told respondent she wanted a divorce. The parties discussed the matter with a mutual friend, a former Judge in Boston, who referred respondent to a Boston attorney. Appellant testified that, in her desire to settle the divorce out of court, she accompanied respondent to the attorney's offices for the initial interview. Respondent did not retain the attorney and had no recollection of the parties' discussion with him.

Respondent's attempts at a reconciliation failed and in August 1980, he signed a "divorce agreement", again, without seeking advice of counsel. Under the terms of this agreement, appellant was to receive: $3,000 per month until she remarried; 20% of the price paid to respondent in the event he sold his interest in the family business for cash, or, in the event he did not sell it or sold it under different terms, respondent's entire interest in property in St. Maarten which he jointly owned with his first wife; and one half of the inheritance respondent would receive upon his mother's death. This handwritten agreement was later formalized by appellant's attorney, with certain modifications.

Respondent concedes that the parties fully discussed their

August 1980 agreement on which the final separation agreement was based. Respondent was also aware that appellant had retained counsel to draft the separation agreement and he discussed the terms of this agreement with her counsel. He did not, however, hire an attorney to represent him although he did discuss the final separation agreement with his accountant, who advised against it. Nevertheless, respondent signed the agreement without reservation.

The separation agreement requires that respondent pay appellant $3,000 per month until her death or remarriage, and that such payments be made by respondent's estate after his demise. Appellant retained a half interest in the value of any inheritance respondent received from his mother. However, she received no interest in the St. Maarten property in the event respondent sold his interest in the family business. Instead, appellant was to receive a $125,000 payment. She also retained ownership of the Park Avenue apartment and all of the contents therein. The personalty located in the rental apartment in Boston was to revert to her in the event respondent died, remarried, or redecorated. Appellant maintains that the changes made in the final separation agreement were all requested by respondent, and she assented to them.

Respondent performed his obligations under the separation agreement for 21 months. However, after appellant instituted this action for a conversion divorce, he ceased paying maintenance. Appellant moved for temporary support, and respondent counterclaimed to set aside the separation agreement. Respondent's motion was denied and he was ordered, in December 1982, to make weekly payments of $692.31 (or $3,000 per month), retroactive to June 1982. Respondent complied with this order until May 1984 when he unilaterally reduced the payments without seeking a court order.

In October 1984, appellant sought a money judgment for the arrears in maintenance and respondent cross-moved for a downward modification of his obligation. Appellant's motion was granted and respondent's cross motion and his claim for rescission of the separation agreement were referred to a Judicial Hearing Officer.

After an eight-month trial which began in May 1985, the Hearing Officer issued an opinion granting appellant a conversion divorce based on the separation agreement. However, he also granted respondent's counterclaim to rescind portions of the separation agreement on the grounds that it was unfair, unconscionable and constituted overreaching by appellant. Despite the fact that respondent had complied with the terms

of this agreement for 21 months, the Hearing Officer found that there had been no ratification. The challenge contained in respondent's counterclaim to set aside the agreement was "sufficiently prompt" given the circumstances and "the emotional volatility and uncertainty that generally characterize the process of marital dissolution." Respondent's lack of counsel and ignorance of his rights under the Equitable Distribution Law was also deemed "a significant factor".

We are unable to agree with the Hearing Officer's conclusion that the separation agreement was unconscionable or the product of overreaching; nor can we agree that this agreement was not ratified by respondent.

In finding that respondent did not ratify the separation agreement, the Hearing Officer relied on *Sheindlin v Sheindlin* (88 AD2d 930, 931 [2d Dept 1982], *appeal dismissed* 57 NY2d 775 [1982]), wherein a husband's application to set aside a separation agreement was denied on the ground that the agreement had been "ratified and approved, and at least partially complied with for almost a three-year period". Inasmuch as respondent herein sought relief from the terms of the separation agreement in less than three years, the Hearing Officer found that his performance under the agreement for 21 months did not constitute ratification.

However, in *Sheindlin,* the court expressly held that a party "who executes a contract under duress and then acquiesces in the contract *for any considerable length of time,* ratifies the contract" (88 AD2d, *supra,* at 931 [emphasis added]). By any measure, 21 months is a considerable length of time and is more than sufficient for a party who has acquiesced to an agreement against his better judgment, or under duress, to raise his objections and to disavow the agreement. The Court of Appeals has held that where there is no evidence that the plaintiff's "claimed incapacity continued through the two years during which the contract was effective and fully performed by defendant, and the benefits received by plaintiff", the plaintiff must be deemed to have ratified the agreement *(Beutel v Beutel,* 55 NY2d 957, 958 [1982]).

In this case, respondent does not allege that he was under any incapacity but, rather, that he was ignorant of his rights under the law when he entered into the agreement and while he performed pursuant to its terms. However, this ignorance was the result of respondent's own, unwise decision. The testimony unequivocally establishes that respondent refused to retain counsel to advise him of his rights and rejected the

advice of knowledgeable individuals regarding the agreements that he signed, because of his overwhelming love and desire to be reconciled with his wife. When it became clear that appellant intended to obtain a divorce, respondent, for the first time, voiced his objection to the separation agreement. Having discovered, belatedly, that his strategy had failed, respondent now claims that the law should protect him from the consequences of his own miscalculation.

A separation agreement between the parties to a matrimonial action is sanctioned under the Domestic Relations Law as an alternative to the equitable distribution statute for dividing property between the parties (§ 236 [B] [3], [5]). Such an agreement is governed by contract law rather than the Domestic Relations Law. A separation agreement may be the basis of a conversion divorce even if substantial provisions therein are unenforceable (Domestic Relations Law § 170 [6]), but not if the agreement "is void *ab initio* as the result of fraud, duress or incapacity" *(Angeloff v Angeloff,* 56 NY2d 982, 984 [1982]).

Even if the facts were not sufficient to establish ratification of the separation agreement, respondent has failed to establish that it was unconscionable or obtained by overreaching. Given respondent's willful refusal to seek legal counsel and his deliberate decision to ingratiate himself with appellant by acceding to her demands, we must conclude that if there was deception practiced it was self-deception on respondent's part. Self-delusion and disappointment do not justify rescission of the agreement which respondent ratified, and on which appellant relied, for nearly two years.

The various agreements preceding the final separation agreement were informally negotiated between the parties, although drafted by appellant's attorneys. There is no evidence that respondent, an experienced businessman, did not understand the financial arrangements that he agreed to and, as noted above, he deliberately chose to remain ignorant of his legal rights. Appellant points out that there was no financial disclosure prior to the drafting and execution of the separation agreement and, apart from her consultation with respondent's accountant, she knew very little about respondent's finances. Respondent was therefore in the superior bargaining position by virtue of his business experience and knowledge of his financial affairs.

There is nothing in the record herein to indicate duress, misrepresentation, or overreaching by appellant. The fact that

respondent gave away more than he might legally have been compelled to give does not mean that the separation agreement was the product of overreaching by appellant.

It was therefore error for the Hearing Officer to rescind the provisions relating to maintenance and the distribution of property in the separation agreement. Appellant was entitled to a conversion divorce incorporating the separation agreement by reference, and to continued performance of that agreement until such time as respondent may demonstrate that he is entitled to a downward modification of its provisions. Concur—Carro, J. P., Asch, Rosenberger, Ellerin and Wallach, JJ.